NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0613n.06
Filed: August 22, 2007

No. 06-4356

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **DARLENE DETERS**, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T  F O R  T H E |
| v. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| **ROCK-TENN COMPANY, INC., ROCK-TENN** | ) | |
| **CONVERTING COMPANY**, | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE: MARTIN, McKEAGUE, Circuit Judges; and GREER, District Judge.***

**McKEAGUE, Circuit Judge**. Plaintiff Darlene Deters was subjected to sexual harassment

by her male supervisor for some three years before reporting it. When she complained, her employer

took prompt and effective corrective action, firing the wrongdoer. Unfortunately for plaintiff, the

replacement supervisor, a woman, was not much easier to get along with. Within six months after

the new supervisor took over, plaintiff had taken a three-month medical leave of absence for work-

related stress, and shortly thereafter commenced this action against her employer for both sexual

harassment and retaliatory constructive discharge. The district court granted the employer's motion

for summary judgment on all claims, concluding plaintiff had failed to adduce sufficient evidence

_____

      * Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.
to establish essential elements of her claims. After carefully considering the record, we are

convinced that the district court's award of summary judgment to the defendant employer was

proper, but we affirm on different grounds.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Darlene M. Deters was hired by Rock-Tenn Converting Company in April 1999 as scale clerk

at its paper recycling plant in Fairfield, Ohio, near Cincinnati. At that time, the plant general

manager was Dan Huschke. Huschke processed Deter's paperwork and acquainted her with

company policy, including the company's sexual harassment policy. Robert Webber was the office

manager. He had started working at the Fairfield plant in 1990. Webber trained Deters in her

responsibilities as scale clerk. Webber and Deters became friends, developed a romantic

relationship, and in 2000, began living together. Although intimate relations between them ceased

in early 2002, they continued to live together on separate floors of the same townhouse and remained

good friends.

In November 1999, Chuck Wuchter became the new plant general manager, the highest

ranking employee at the Fairfield plant, and Deters' immediate supervisor. Wuchter's immediate

supervisor was Steve Flanagan, Vice President of Rock-Tenn's Recycle Division. Flanagan's office

was in Atlanta.

Shortly after Wuchter took over, he began making inappropriate comments to Deters,

describing his sex life with his wife and affairs with other women. Deters described Wuchter as

"manipulative" and "very full of himself." He would casually suggest various sex acts, make

sexually explicit comments, and make sexually suggestive and obscene gestures.  In April 2000, Wuchter invited Deters out to lunch on Secretary's Day and asked her to have an affair with him.  She declined the invitation.  Shortly thereafter, Wuchter hired his stepson and commenced an affair with his stepson's wife.  Wuchter would often describe his sexual relations with the stepson's wife to Deters.  The sex talk and sexual gestures were daily occurrences, even after Deters consistently rejected Wuchter's overtures.

Deters did not appreciate Wuchter's continuous sex talk, but she didn't tell him so; she believed he would fire her if she told him to stop.  Although other employees noticed that Wuchter was in Deters' office an inordinate amount of time, even Webber, with whom she lived, did not know of the ongoing harassment.

On October 24, 2002, Rock-Tenn CEO Jim Rubright issued a memorandum to all company management personnel, urging them to report any suspected unlawful or unethical conduct in the workplace.  Webber received the memo.  Although he was unaware of Wuchter's inappropriate conversations with Deters, Webber informed her that he was preparing a report to send to Rock-Tenn headquarters regarding alleged financial and other improprieties in the management of the Fairfield plant.  This prompted Deters to inform Webber about Wuchter's inappropriate conversations. Webber in turn reported Deters' complaint, among other concerns, to Bill Smith, Divisional Director for Employees in Organizational Effectiveness.

Smith received a letter from Webber, dated November 18, 2002, detailing his concerns.  Out of 15 paragraphs, one is devoted to Deters' concerns.  On December 5, 2002, Smith traveled from Atlanta to Cincinnati to investigate the concerns raised by Webber.  He met with Deters and Webber

to discuss the matter of Wuchter's inappropriate conversations. He also interviewed two other employees, Tim Vannatta and Hoa Nguyen, regarding their relationship with Wuchter and plant superintendent Ernie Young. Among the concerns communicated by Webber and targeted by Smith's investigation, Deters' problems with Wuchter appear to have been secondary to the reported tensions between Young and Vannatta and Nguyen, tensions reportedly exacerbated by Wuchter's mismanagement.

Based on what he learned in the interviews, Smith recommended to Flanagan that both Wuchter and Young be terminated. Smith characterized the plant as a "powder keg," "an extremely volatile working environment." He considered management's tolerance of sexually explicit comments in the workplace, and the fact that Vannatta and Nguyen felt physically threatened by Young to be evidence of mismanagement by Young and Wuchter. Flanagan agreed with the recommendation, but he decided to postpone the terminations until after the Christmas and New Year's Day holidays.

In the meantime, Wuchter was not advised of the pendency of the investigation. In the interest of honoring confidences, minimizing retaliation, and safeguarding employee safety, Flanagan attempted to proceed as discreetly as possible. For this reason, Deters was not separated from Wuchter during the weeks leading up to the actual termination. In addition, Smith explained that he did not believe Deters had been intimidated by Wuchter or had requested they be separated; she just wanted the inappropriate comments stopped. On December 9, 2002, Deters advised Smith by e-mail that she was uncomfortable with the situation and that if Wuchter's inappropriate behavior continued, she might have to "get up and walk out." Smith reassured her that a plan of action was

in the works. He urged her to "hang in there" and "absolutely let [him] know if anything goes on." There is no evidence that Deters complained of any continuing sex talk in the next weeks.

Flanagan terminated Wuchter in a face-to-face meeting on January 15, 2003. Prior to the termination, Flanagan had informed Deters that he would take Wuchter off-site to terminate him and that he would not be allowed to return to the plant. However, during the course of the off-site meeting, in which he did not specifically mention Deters' complaint to Wuchter, Flanagan reconsidered and decided to allow Wuchter to return to the plant. Flanagan hoped that allowing Wuchter to return to say good-bye to his coworkers would help defuse the potential for violence in Young's reaction, as Young was contemporaneously advised of his own termination. Prior to returning to the plant, Flanagan called Deters and alerted her, saying that if she was uncomfortable, she could go home. Instead, Deters, feeling stunned and panicky, chose to lock herself in Webber's office. As Wuchter returned and met with the other employees, he repeatedly called for Deters to come out, but she refused. Wuchter said good-bye to the others and left.

To replace Wuchter as plant general manager, Flanagan transferred Sue Beene from Chattanooga. Smith and Flanagan informed Beene of the reasons behind Wuchter's and Young's terminations, although Beene testified that she did not remember the conversation. Beene eventually did learn from others about Wuchter's affair with an employee's wife and about his degrading behavior toward Deters.

Initially, Deters was happy to be supervised by a woman. Once Beene settled in, however, she brought changes that Deters had trouble adjusting to. For one, Deters thought Beene was unpleasant and unfriendly toward her. Deters identified three incidents when Beene "yelled" at her

unnecessarily: (1) in response to Deters inquiring about whether a raise would accompany her acceptance of increased duties; (2) when Deters, per prior custom, allowed a truck to drive around the plant; and (3) after Webber acted on Deters' suggestion to leave early one day when he wasn't feeling well. Also, Beene prohibited Deters' prior practice of working overtime during the week in order to leave early on Fridays.

Apart from her general discomfort working under Beene, Deters acknowledged that she had not received any disciplinary action or suffered other adverse treatment in the terms and conditions of her employment. Nor was Deters able to identify anything said by Beene that indicated her harsh actions were motivated by any discriminatory or retaliatory motive. However, Deters noted (1) that Beene had yelled similarly at both Vannatta and Nguyen; and (2) that Vannatta, Nguyen and Webber, the three other employees who had participated in the investigation that led to Wuchter's and Young's firings, were all terminated within six months after Beene began working at the plant. Deters also felt that she was being set up to fail in that she was asked to assume greater responsibilities, but was not afforded the training she needed. She felt that Beene had been sent there by Flanagan to "get rid of the troublemakers, the whistle blowers."

Deters complained to Smith about Beene's management style and her suspicion that there was a retaliatory motive behind Beene's actions. Smith made inquiry of Beene and was satisfied that Beene's actions and expectations were "business-based" and "reasonable." In regard to Beene's communication style, Smith acknowledged that she is "not warm and fuzzy and she's very, very matter-of-fact, businesslike, and direct." Smith did not find anything inappropriate in Beene's actions.

Immediately after Webber was terminated in August 2003, Deters experienced such severe anxiety that she was admitted to an outpatient treatment program for work-related stress. She requested and was granted a leave of absence under the Family and Medical Leave Act. Deters understood that her position at the Fairfield plant awaited her on completion of treatment, with the same wages and benefits. In fact, Beene thought that Deters was professional and competent and had made improvements in response to instruction. However, prior to her anticipated return in November 2003, Deters submitted her resignation by e-mail, explaining: "Due to the hostile working conditions that existed there for me, I can no longer for my health sake, continue to work there."

Even before she had tendered her resignation, Deters had, on October 1, 2003, filed a discrimination charge against Rock-Tenn with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission. She complained of sexual harassment by Wuchter and retaliatory harassment by Beene. After receiving her Right to Sue notice, Deters commenced this action by filing her complaint in the Southern District of Ohio on November 30, 2004. The complaint contains nine counts. Counts I through IV assert claims for sexual harassment and sex discrimination under Title VII and Ohio law. Counts V and VI assert claims for retaliation under Title VII and Ohio law. Counts VII, VIII and IX assert state common law tort claims for breach of public policy, sexual harassment, and negligent retention.

On September 21, 2006, the district court granted Rock-Tenn's motion for summary judgment in its entirety. The district court construed Deters' sexual harassment claims as the premise for a constructive discharge theory of relief. The court held Rock-Tenn was entitled to

summary judgment for three reasons: (1) Deters' EEOC charge was not filed within 300 days after the last alleged act of sexual harassment by Wuchter; (2) Deters' EEOC charge did not include a claim for constructive discharge; and (3) considering the lengthy period of time between Wuchter's harassment and Deters' resignation, no reasonable jury could find that Deters was compelled to resign in November 2003 due to intolerable working conditions resultant from sexual harassment that terminated in January 2003.

The district court also held that the record failed to substantiate Deters' retaliation claims. The court characterized the adverse treatment visited upon Deters by Beene as "petty slights" not sufficiently serious to support a retaliation claim. The court further held that Deters had failed to demonstrate the existence of a causal connection between Beene's alleged retaliation and Deters' earlier complaint about Wuchter's harassment.

On appeal, Deters challenges these rulings, maintaining that she did present sufficient evidence to create genuine issues of material fact on her sexual harassment and retaliation claims.[1]

## II. ANALYSIS

### A. Summary Judgment Standard

The court of appeals reviews *de novo* an order granting summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[1]On appeal, Deters has not challenged the award of summary judgment to Rock-Tenn on the common law tort claims contained in counts VII, VIII and IX of her complaint.

judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id*. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2005). A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id*.

**B. Hostile Work Environment Sexual Harassment**

**1. *Threshold Matters***

Counts I and II of Deters' complaint set forth sexual harassment and sex discrimination claims, respectively, under Title VII, 42 U.S.C. § 2000e *et seq.* Counts III and IV set forth complementary sexual harassment and sex discrimination claims under Ohio law, Revised Code § 4112. The sex discrimination claims are premised on the same allegations as the sexual harassment claims. That is, Deters has not alleged that Rock-Tenn engaged in sex-based discrimination against her in the terms and conditions of her employment in any way distinct from the sexual harassment she experienced under Wuchter's supervision. In other words, the sex discrimination claims are entirely superfluous under the facts of this case; they rise or fall with the sexual harassment claims. Indeed, the district court did not address the discrimination claims separately from the sexual harassment claims and the parties have not argued the sex discrimination claims separately from the

sexual harassment claims. Consistent with the approach of the lower court and the parties, we do not address the sex discrimination claims independently from the sexual harassment claims.

Regarding a second threshold point, the district court correctly recognized that sexual harassment claims under Ohio Revised Code § 4112 are generally governed by the same standards as sexual harassment claims under Title VII, citing *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 609-10 (1991). *See also Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 564 (6th Cir. 2004). Accordingly, like the district court and the parties, we analyze Deters' sexual harassment claims collectively under federal law standards.

### 2. *Timeliness of Claim*

Deters' sexual harassment claims are based on the hostile work environment allegedly created by her supervisor Chuck Wuchter from November 1999, when he commenced work at the Fairfield plant, until January 15, 2003, when he was discharged. As a first reason for granting defendant Rock-Tenn's motion for summary judgment, the district court summarily concluded that Deters' sexual harassment claims are time-barred because she failed to comply with Title VII's requirement that her EEOC charge be filed within the requisite time period after an alleged unlawful employment practice occurred. The governing time period in this case is 300 days, under 42 U.S.C. § 2000e-5(e).

Deters maintains that her EEOC charge, filed on October 1, 2003, was timely filed because she suffered continuing harassment from Wuchter in December 2002 and January 2003, less than 300 days prior to the filing of her charge. Although Deters has not identified any particular incident of harassment during December 2002 and January 2003, her deposition testimony and other record

evidence indicate that Wuchter's sex talk was pervasive, "a daily, daily, daily thing." Deters dep. p. 143, JA 587. That Deters continued to perceive the workplace as a hostile environment during the last two months of Wuchter's employment is also substantiated by e-mail memos sent by Deters and Webber to Smith on December 9, 2002, and January 6, 2003, respectively, JA 788, 789. Inasmuch as Deters did not expressly state her objection to Wuchter, and neither Flanagan nor Smith advised Wuchter of Deters' complaint or the pending investigation, there is no reason to believe that Wuchter's "daily" boorish behavior suddenly abated during the last month of his employment.

Viewing the record in the light most favorable to Deters, it is sufficient to give rise to a genuine fact issue regarding the timeliness of Deters' EEOC charge. The district court's unexplained and unwarranted reliance on the untimeliness of the charge as a basis for summary judgment is erroneous.

**3. *Constructive Discharge Theory***

A second reason given by the district court for granting Rock-Tenn's motion for summary judgment on the sexual harassment claims is Deters' failure to include her constructive discharge claim in her EEOC charge. The district court improperly conflated Deters' constructive discharge theory with her sexual harassment claims. Deters' complaint does not contain any independent claim for constructive discharge. Counts I and III are sexual harassment claims, based on Wuchter's misconduct. They include no allegations of constructive discharge. Constructive discharge is alleged only in connection with Deters' retaliation claims, counts V and VI, which are based on the harsh treatment she received from Sue Beene, not on Wuchter's harassment. Dismissal of Deters'

sexual harassment claims, which do not embody a constructive discharge theory, because the EEOC sexual harassment charge does not include the constructive discharge theory simply makes no sense.

The district court implicitly recognized this in its truncated assessment of the merits of Deters' sexual harassment claims. The court held that "a reasonable jury could not find that plaintiff's decision to resign [in November 2003] was a foreseeable consequence of the harassment to which she had been subjected while Mr. Wuchter was employed by the company [ending in January 2003]." Opinion p. 12, JA 468. The district court is right: a reasonable jury could not so find. Indeed, Deters did not even so allege. The fallacy lies in the district court's conflation of the sexual harassment claims with the constructive discharge theory actually asserted in relation to the retaliation claims. Yet, though Deters is clearly not entitled to a judgment on a hypothetical claim that Wuchter's harassment resulted in her constructive discharge, this does not dispose of the question whether she is entitled to a judgment on the asserted claims that Wuchter's harassment resulted in *other* injuries for which Rock-Tenn is liable.

## 4. *Hostile or Offensive Environment*

The district court paid lip service to the governing standards, but failed to apply them.[2] "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). In order to establish a prima facie case of hostile work environment based on sexual harassment, Deters must show by a preponderance of the evidence: (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

It is undisputed that the first three elements of this standard are met on the present record. To assess the fourth element, the court must consider "'all of the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

---

[2]One alternative is to vacate the district court's summary judgment on the hostile work environment claims and remand the matter for the district court to conduct the appropriate analysis in the first instance. On the other hand, because we review the grant of summary judgment *de novo*, we may affirm the judgment on grounds other than those employed by the lower court, as long as the party opposing summary judgment is not denied the opportunity to respond. *Carver v. Dennis*, 104 F.3d 847, 849 (6th Cir. 1997). Here, the factual record has been adequately developed and both parties have asserted appellate arguments under the governing standards. We therefore proceed to address the question whether there is a genuine issue of material fact on the merits of Deters' hostile environment claims, or on Rock-Tenn's affirmative defense, that should forestall summary judgment.

employee's performance.'" *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (quoting

*Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)). The "conduct in question must be judged by both

an objective and a subjective standard: the conduct must be severe or pervasive enough to create an

environment that a reasonable person would find hostile or abusive, and the victim must subjectively

regard that environment as abusive." *Id.* at 658 (quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822,

826 (6th Cir. 1997)).

Rock-Tenn feebly attempts to minimize the offensive nature of Wuchter's comments and

behavior. Although there is no evidence that Wuchter was physically intimidating, his undisputed

and seemingly constant preoccupation with, and unwelcome communications about, his own sexual

prowess, often while alone with the only female employee in the workplace, are, judged by any

reasonable standard, degrading, abusive and inexcusable.

Rock-Tenn nonetheless questions whether Deters herself subjectively perceived the attention

she received from Wuchter as offensive. In support, Rock-Tenn cites her failure to inform anyone

about the inappropriate conversations for some three years. She did not register an objection with

Wuchter. She did not report any concern even to Webber, the officer manager, with whom she

resided day in and day out as the harassment was ongoing. Rock-Tenn also cites Smith's

understanding, gleaned from his interview with Deters, that although "she felt uncomfortable with

some of the comments, . . . she was not offended by them;" and that although she "wanted the

comments to stop, . . . she didn't want him to lose his job." Smith dep. pp. 28-29, JA 730-31.

Again, however, viewing the record in the light most favorable to Deters—particularly her

deposition testimony, Deters dep. at 138-147, JA 582-91; the e-mail messages from Deters and

Webber to Smith, JA 788-89; and Webber's letter to Smith, JA 697-700—it is clear that a triable issue of fact has been presented on the fourth element, the offensiveness of the work environment.

**5. *Employer Liability***

As to the fifth element of Deters' prima facie case, Rock-Tenn is vicariously liable for sexual harassment of Deters by Wuchter, her supervisor, even though it did not result in tangible adverse actions in the conditions of her employment (e.g., discharge, demotion or undesirable reassignment) *unless* Rock Tenn establishes its affirmative defense by a preponderance of the evidence. Rock-Tenn does this by demonstrating (a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that Deters unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Jackson*, 191 F.3d at 659.

Generally, an employer satisfies the first element of this two-part standard when it has promulgated and enforced a sexual harassment policy. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. Courts have not set an exact formula for assessing sexual harassment policies, but the Sixth Circuit has provided the following guidance: "[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy." *Clark v. United Parcel Service, Inc.*, 400 F.3d at 341, 349-50 (6th Cir. 2005) (citations omitted).

The record evidence demonstrates that Rock-Tenn had promulgated and posted a facially effective sexual harassment policy. Huschke aff., JA 341-44; Caldwell aff., JA 346-50. Dan Huschke, the plant general manager who preceded Wuchter, and the administrator who completed Deters' new-hire paperwork, attested to the facts that he advised her of the sexual harassment policy, and that she had access to the policy manual that included the policy. Huschke aff. ¶¶ 8, 9; JA 341-42. Mark Caldwell, who served as interim plant superintendent at the Fairfied plant from February 2003 to April 2003, attested to having observed that the policy was prominently posted at the plant prior to January 2002. Caldwell aff. ¶¶ 4, 6; JA 346-47. Deters admitted knowing that the policy was posted on the bulletin board, but she testified that no one pointed it out to her and she never bothered to read it. Unemployment comp. hrg. tr. p. 4, JA 335. That Deters was familiar with the policy and knew how to use it is demonstrated, however, by the fact that she had earlier lodged a complaint with Flanagan concerning inappropriate conduct of a sexual nature by a truck driver. Deters dep. pp. 28-29, 65, JA 528-29, 560.

The closer question in connection with Rock-Tenn's affirmative defense is whether Deters has been shown to have been unreasonable in failing to report Wuchter's misconduct. Deters justifies her three-year failure to report the ongoing misconduct by explaining that she valued her first office job since the early 1980s as an opportunity to build her skills and start a new life for herself. Deters dep. at 60, JA 556. She didn't want to jeopardize the opportunity by complaining to Wuchter, her boss, because she feared he might fire her. *Id*. at 135-38, JA 579-82. She felt she could not complain to Flanagan, because she believed Flanagan and Wuchter were friends. *Id*. at 65-66, JA 560-61. Deters argues that, under these circumstances, her failure to report the

misconduct was reasonable. In support, she cites *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 511 (6th Cir. 2001), where Judge Gilman observed that an employee's "reluctance" to report harassment by a supervisor was "entirely understandable." *Id*. (quoting *Williams v. General Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999)).

What Deters fails to point out is that Judge Gilman's opinion in *Harbert-Yeargin* carries no controlling weight (1) because it is a dissenting opinion; and (2) because the language borrowed from *Williams* is pure dictum, as the *Williams* court expressly declined to rule on whether the plaintiff's "understandable reluctance" amounted to an "unreasonable failure to take advantage of available preventive or corrective opportunities provided by the employer." *See Williams*, 187 F.3d at 567.

In opposition, Rock-Tenn relies on various authorities from other circuits. First, Rock Tenn cites *Howard v. Winter*, 446 F.3d 559, 567 (4th Cir. 2006), where the court emphasized that an employee is obliged to make "a concerted effort to inform the employer that a problem exists." *Howard* is inapposite, because it is a co-worker harassment case, rather than a supervisor harassment case. In a co-worker harassment case, the employer's liability is direct, not vicarious, and is based on its knowledge, whether actual or constructive, of wrongdoing and failure to correct it. *See Jackson*, 191 F.3d at 659.

Second, Rock-Tenn cites *Williams v. Missouri Dep't of Mental Health*, 407 F.3d 972, 977 (8th Cir. 2005). In *Williams*, the Eighth Circuit expressly rejected the plaintiffs' argument the reasonableness of their failure to report the supervisor harassment posed a question of fact. The court held as a matter of law that "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly

hostile environment." *Id*. (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999)).

Third, Rock-Tenn cites another Fourth Circuit ruling, *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001). *Barrett* is a supervisor harassment case where the court expressly rejected arguments like those here made by Deters, i.e., that nebulous fear of retaliation and perceived futility (because members of the management team happened to be friends) excused the employee's failure to report supervisor harassment.

Although the analysis employed in this line of cases, *Williams*, *Shaw*, *and Barrett*, is not controlling, it is persuasive. To be sure, Deters' reluctance to complain is "understandable" and her suffering in silence may even be characterized as an arguably "reasonable" way, viewed from *her* perspective, of ensuring that she retained her cherished position at Rock-Tenn. However, the calculus changes when the reasonableness of Deters' silence is scrutinized with an eye toward whether the law should hold the employer liable for Wuchter's clearly offensive, yet unreported, sex talk. Where, as here, Rock-Tenn had no knowledge of Wuchter's misconduct until November 2002; Rock-Tenn conducted a professional and discrete investigation in December 2002 once the misconduct was reported; and Rock-Tenn took swift and firm corrective action in January 2003 by firing Wuchter; the record strongly suggests that Deters' three-year failure to complain was *unreasonable*—rendering her unwittingly complicit in Wuchter's ongoing harassment, and depriving Rock-Tenn of the wherewithal to earlier take appropriate corrective action, for her sake and the sake of the company's other employees.

Paradoxically, Deters now argues, despite *her* three-year delay in complaining, that Rock-Tenn has failed to establish the affirmative defense: because its corrective response, postponing

Wuchter's termination from mid-December 2002 until mid-January 2003, was too slow; because it failed to separate her from Wuchter in the meantime; and because Wuchter was allowed to momentarily return to the plant after he was advised of his termination. Our review of the record, however, indicates that Rock-Tenn handled her complaint with sensitivity and professionalism. Postponing Wuchter's actual termination until after the holidays seems an unnecessary courtesy, but it gave Rock-Tenn a reasonable opportunity to plan for Wuchter's and Young's replacement. Further, considering that Deters had not even complained for three years and was not subject to any apparent physical threat or increased risk of harm, Rock-Tenn can be excused if it failed to apprehend a sense of urgency. Rock-Tenn's decision not to separate Deters and Wuchter during the pendency of the investigation appears to have been deliberately and reasonably calculated to minimize any risk of retaliation, inasmuch as Wuchter was not advised of Deters' complaint until he was terminated. Similarly, Flanagan's decision to allow Wuchter to return to the plant at the time he was terminated appears to have been motivated by reasonable concerns for workplace safety, as Flanagan sought to defuse the possibility of a a violent reaction by Ernie Young. Yes, this created an awkward, embarrassing situation for Deters, but she contributed to it by deciding to stay in Webber's office rather than removing herself from the plant before Wuchter returned.

Given the benefit of hindsight, Rock-Tenn might have handled some things differently, but the record clearly supports the finding by a preponderance of the evidence that Rock-Tenn's response to Deters' report of harassment was reasonable under the all the circumstances. It also supports the finding, for the reasons stated, that Deters' failure to earlier report Wuchter's harassment was unreasonable. We therefore conclude that Rock-Tenn established its *Ellerth/Faragher* affirmative

defense to employer liability. The award of summary judgment to Rock-Tenn on Deters' sexual harassment claims is affirmed, on grounds other than those relied on by the district court.

## C. Retaliation

### 1. *Threshold Matters*

Deters' count V and VI retaliation claims are premised on allegations that Rock-Tenn, through the actions of new plant general manager Sue Beene between February and August 2003, retaliated against her for having complained of Wuchter's harassment by creating working conditions so hostile that she was compelled to resign. The district court granted Rock-Tenn's motion for summary judgment on these claims, concluding Deters had failed to adduce sufficient evidence that she was subject to materially adverse actions or that the actions, even if sufficiently adverse, were causally connected to her earlier sexual harassment complaint.

Again, the district court correctly recognized that the federal and state law retaliation claims are governed by the same standards. *See Abbott v. Crown Motor Co., Inc.,*, 348 F.3d 537, 541-42 (6th Cir. 2003).

Although, as discussed above, the district court erroneously held that Deters' failure to include her constructive discharge theory in her EEOC charge precluded her prosecution of her sexual harassment claims, the court did not invoke this reasoning in connection with the retaliation claims, where Deters *has* actually asserted the constructive discharge theory. Rock-Tenn contends it should have.

Deters' EEOC charge, filed in October 2003, one month before she tendered her resignation, does not assert that Beene's retaliatory harassment resulted in her constructive discharge. Nor did

Deters amend her charge to include such an allegation after she had resigned. Yet, the Sixth Circuit has, under such circumstances, construed an EEOC retaliation charge prepared by a pro se claimant liberally as including retaliation so naturally growing out of an underlying charge that it should have been foreseeable to the defendant. *Tisdale v. Federal Express Corp.*, 415 F.3d 516, 527-28 (6th Cir. 2005); *Abeita v. TransAm. Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998). This rule applies perfectly in this case. When Deters filed her EEOC charge while still on medical leave due to work-related stress, Rock-Tenn clearly should have been able to foresee the possibility that Deters would pursue relief for constructive discharge if she did not eventually return to work. It follows that Deters' failure to expressly include the constructive discharge theory in her EEOC charge is no impediment to exercise of federal jurisdiction over the the constructive discharge theory of Deters' retaliation claims.

### 2. *Materially Adverse Action*

In order to establish a prima facie case of retaliation, Deters must show that:

(1) she engaged in activity protected under Title VII; (2) the defendant knew that she engaged in protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected.

*Randolph v. Ohio Dep't of Youth Services*, 453 F.3d 724, 736 (6th Cir. 2006). There is no dispute that the first two elements of Deters' prima facie case are satisfied. The district court found the record wanting in connection with elements three and four, however.

The district court quoted at length from the Supreme Court's recent ruling in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. — , 126 S.Ct. 2405, 2414-15 (2006), emphasizing

that action is "materially adverse" if it is not trivial, petty or slight, but might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. The district court went on to consider the various asserted adverse actions taken by Beene, i.e., her request that Deters take on more responsibilities, her alleged failure to provide Deters with needed training to assume more responsibilities, her unfriendliness toward Deters, and her occasional yelling at Deters. In the language of *White*, the district court characterized these actions as "petty slights, minor annoyances, and simple lack of good manners."

Deters contends the district court erred in its assessment by expressly excluding from consideration the impact of Wuchter's past sexual harassment on *her* reaction to Beene's adverse actions. Deters recognizes that the court must, per *White*, apply an objective standard and consider the reaction of a "reasonable employee," but she urges the court to heed *White*'s admonition to consider all the circumstances from the perspective of "a reasonable person in the plaintiff's position." *White*, 126 S.Ct. at 2416.

The district court did note, with reference to *White*, that it was not required to consider the nature and seriousness of Wuchter's sexual harassment in assessing whether Beene's actions would dissuade a reasonable person in Deters' position from making or supporting a charge of discrimination. Rather, the court observed, the "materially adverse" determination is made with reference to the challenged retaliatory acts, not the underlying discriminatory conduct originally complained of. Still, the court also correctly observed that whether adverse action would deter a reasonable employee depends on the facts of the particular case. Per *White*, "context matters." 126 S. Ct. at 2415. "The real social impact of workplace behavior often depends on a constellation of

surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998)).

The district court correctly ruled that Wuchter's past harassment could not be considered to be retaliatory conduct by Rock-Tenn because it occurred *before* Deters engaged in the protected activity of complaining about it. Yet, this truism does not preclude consideration of Wuchter's past harassment as bearing on the objective reasonableness of Deters' reaction to the subsequent actions by Beene—if relevant. To the extent there is a factual basis, beyond Deters' subjective perception, for her contention that Beene's harsh treatment of her was motivated by retaliatory animus stemming from Deters' complaint about Wuchter, her sense of outrage, injustice and oppression could reasonably be expected to grow, rendering the wrongfulness of the underlying harassment more relevant to the "materially adverse" determination.

There is thus an interconnectedness between the third and fourth elements of Deters' prima facie case. We therefore look to the evidence of a causal nexus between Beene's actions and Deters' earlier sexual harassment complaint in assessing the reaction of a reasonable person in Deters' position to Beene's actions. If there is no factual basis for the perceived retaliatory animus, the perception is purely subjective; not that of an objectively reasonable person in the plaintiff's position. If, on the other hand, there is sufficient evidence to create a triable issue regarding causal nexus, that same evidence would tend to support a finding that Deters' reaction was reasonable and that Beene's actions toward her were "materially adverse."

### 3. *Causal Nexus*

The district court held that the only evidence of a causal nexus between Deters' sexual harassment complaint and Beene's adverse treatment of her consisted of temporal proximity, which it correctly held was insufficient, standing alone, to create a genuine issue of material fact. *See Randolph*, 453 F.3d at 737. Deters objects, insisting there are other indicia of retaliatory conduct, which combine with temporal proximity to create a genuine issue of material fact regarding causation. These other indicia of retaliatory conduct are said to consist of the terminations, one by one, of all three other employees who participated in the investigation that culminated in Wuchter's and Young's firings. The terminations of Vannatta, Nguyen and Webber are said to evidence a "campaign of retaliation." Deters contends the district court erred by ignoring this evidence.

The record surrounding these three terminations is not well-developed. While the terminations arguably represent curious circumstantial evidence, their significance is ambiguous. Deters acknowledges there is no direct evidence that Beene's actions against her were motivated by retaliatory animus. Nor is there any apparent reason in logic to believe that Rock-Tenn intended to retaliate against Deters. She had finally come forward with the complaint that helped Rock-Tenn rid its Fairfield plant of a poor manager whose abusive misconduct has been never been disputed, defended or excused. She appears to have been treated as a valued employee, as evidenced by Rock-Tenn's willingness to fire Wuchter and keep her. Even Beene, despite her apparent personality clash with Deters, "thought Darlene was professional" and "that she tried to handle the things that she did very well." Beene dep. p. 55, JA 508. Smith, who by all appearances treated Deters fairly in relation to Wuchter's harassment, investigated her concerns about Beene and determined that Beene's actions

were "business-based," "reasonable," and not "inappropriate." Smith dep. pp. 98, 114, JA 773, 777.[3]

 Three months after Deters had taken a medical leave of absence, Rock-Tenn still had kept her position available for her return, at the same wages and benefits. Deters dep. at 121-22, JA 573-74.

Nevertheless, Deters contends that her difficulties with Beene, coupled with Rock-Tenn's termination of Vannatta, Nguyen and Webber within eight months after Wuchter and Young had been removed, evidence retaliatory animus. She does not however, explain why such an inference is justified.

The record indicates that the decision to terminate Vannatta was made by Beene with Flanagan because Vannatta was not generating new customers and was not producing the sales that the company expected him to produce. Beene dep. pp. 64-65, JA 512-13. Beene's testimony is in this respect is corroborated by Webber, who had informed Smith and Flanagan of Vannatta's performance deficiencies months earlier. Webber dep. ex. 4, JA 339.

 The circumstances surrounding Nguyen's "termination" are also unclear. According to Flanagan, Nguyen was not terminated, but had been injured on the job and received workers' compensation benefits. Upon his return to work, he could only perform light duty work. Flanagan dep. pp. 81-82, JA 683-84. It appears Nguyen's employment with Rock-Tenn came to an end when there was no longer any suitable light duty work available for him. Beene dep. p. 101, JA 518.

---

[3]*See also* Rock-Tenn's November 20, 2003 response to Deters' EEOC charge, authored by Smith and explaining the structural changes introduced by Beene at Fairfield.

Webber was terminated by Flanagan in August 2003 because he had "developed a pattern of leaving early every day for a period of time," and because he was insubordinate to Beene when she called him on one such day to ask where he was. Beene dep. pp. 68-69, JA 515-16.

In other words, the record substantiates legitimate non-retaliatory reasons why Vannatta, Nguyen and Webber ceased to be employed by Rock-Tenn. Deters has made no effort to rebut this showing with evidence that the given reasons are false or pretextual. On the present record, there is no reason why the other employees' terminations should give rise to an inference that Beene's unpleasant treatment of Deters was motivated by retaliatory animus. There is no genuine fact issue going to the causal nexus element of Deters' prima facie case. Because the temporal proximity of Beene's adverse actions to Deters' sexual harassment complaint stands alone, it is insufficient to justify a reasonable inference that Beene's conduct was retaliatory.

Accordingly, the district court's award of summary judgment to Rock-Tenn on Deters' retaliation claims must be affirmed for lack of evidence of causation. Further, as explained above, this lack of evidence of a causal nexus also undermines Deters' establishment of the third element of her prima facie case, requiring materially adverse action. That is, there being no evidence substantiating Deters' suspicion that Beene's harsh treatment of her was motivated by retaliatory animus, Deters' rather extreme reaction to Beene is seen to stem from subjective perceptions and has not been shown to be the reaction of an objectively reasonable person.

### III. CONCLUSION

The district court's opinion is marked by incorrect reasoning, but closer inspection of the record confirms that the court reached the right result on the claims presented to it. While plaintiff

Darlene Deters appears to have suffered from poor working relationships with both Chuck Wuchter and Sue Beene, the record offers insufficient evidentiary support for her claims against her employer, defendant Rock-Tenn. The district court's summary judgment order must therefore be and is **AFFIRMED**.